Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB















Opinion issued
December 14, 2006








                                                            

                        

                                    

                                                

            

 

 

 

 

 










 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NOS. 01-05-00074-CR

          01-05-00075-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



Robert Anthony Brown, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 228th District Court

Harris County,
Texas

Trial Court Cause Nos. 990261 & 990262

 








 



OPINION ON REHEARING

          The
State charged appellant Robert Anthony Brown with aggravated robbery with a
deadly weapon and impersonation of a public servant.  A jury found Brown guilty of both offenses,
and after finding two enhancement paragraphs true, sentenced him to forty-five
years’ imprisonment for each offense.  In
five issues, Brown contends the evidence is legally and factually insufficient
to sustain the jury’s verdict on aggravated robbery with a deadly weapon, the
trial court erred in denying his motion to suppress evidence obtained during a
search of his motel room, and the trial court erred in admitting evidence of
extraneous offenses during the punishment phase.  In our opinion dated August 3, 2006, we
affirmed the felony conviction for impersonation of a public servant, but held
that the evidence was factually insufficient to support the jury’s verdict on
the aggravated robbery conviction regarding the use of a deadly weapon.  We therefore reversed and remanded for a new
trial as to that charge only.  The State moved
for rehearing and rehearing en banc, contending that Brown did not raise a specific
factual sufficiency challenge as to the deadly weapon element of aggravated
robbery, and that, in any event, the evidence is factually sufficient to
support the jury’s finding of the deadly weapon element of aggravated robbery.  We withdraw our previous opinion and issue
this opinion in its stead.[1]  We affirm the trial court’s judgments in full.

Facts

One evening in June 2003, Jose Galvez
cashed his paycheck at a convenience store near his home, and chatted with some
friends who work at a local strip club.  On
his way home, Galvez observed a white pickup truck following him that he had
noticed at the convenience store.  The
truck displayed what he believed to be police lights.  He drove the short distance to his home,
where he pulled into his driveway.  The
truck pulled up behind him, blocking him in. 
Rene Sanchez exited the truck, approached Galvez, showed him a police
badge, and told Galvez in broken Spanish that he had pulled him over for looking
for prostitutes and drugs. 

          Sanchez
ordered Galvez to spread his legs and place his hands on the seat of his
vehicle while he checked Galvez’s driver’s license in his computer.  Galvez testified that when he had been pulled
over previously, the officers had given him similar instructions.  While Sanchez supposedly checked Galvez’s identification
(“ID”), Brown stood by the passenger’s side door of the truck shining what Galvez
believed to be a police flashlight at Galvez’s tags and house.  Galvez testified that Brown held a flashlight
in one hand and something else in the other hand, and made signs as though he
had a weapon.  Galvez testified that
another man, the driver, waited inside the truck, but Galvez’s wife, Amanda,
testified that she saw only two men, Brown and Sanchez.  After waiting a moment for Sanchez to check
his ID, Galvez approached Sanchez’s truck and noticed that it contained some
dirty clothes but no computer, at which point Sanchez grabbed Galvez, threw him
against the side of the truck, and put a gun to his head.  Galvez testified that he did not know if
Sanchez’s gun was real, but it felt cold against his skin and he was afraid. 

          Amanda
was in the house when the incident began, but went onto her porch when she saw
the lights outside.  Amanda
testified that she came out of the house three separate times during the
robbery.  The first time she just noticed
that the men were not friends of her husband so she immediately went back
inside.  The second time, her children
ran out of the house to see their father so Amanda went after them.  While she was outside, she saw Brown holding
a bright light in his left hand and a walkie-talkie in his right hand.  Amanda then went outside a third time with
her children close behind her.  She
walked toward Brown and saw that he was holding a bright light in his left hand
and a gun in his right hand.  Brown
pointed the gun at Amanda and her children and said, “bitch, get in the house
or there’s going to be problems for you and your family.”  Brown tried to blind Amanda with the light
but she testified that she could still see him. 
Amanda saw Sanchez quietly say something to Galvez, and
Galvez then asked her to please go in the house.  Amanda returned to her house again, and when
she looked through her window, she saw Brown talking on a walkie-talkie, which
he held in his right hand, while still shining the light at her house with his
left hand.  During the incident, Sanchez
took Galvez’s wallet, keys, and cellular phone, after which the men re-entered
their truck and drove away.

          Nine
days later, Officer Mike Burdick pulled Brown over in a white 1988 Chevy pickup
truck after observing Brown turn right without signaling.  After neither Brown nor his passenger, Robert
Jackowski, could provide him with ID, Officer Burdick placed the men under
arrest.  As Brown exited the vehicle,
Officer Burdick noticed several flashlights in the front seat, a Q-Beam spotlight
on the floorboard, and what appeared to be a gun under the driver’s seat.  At that point, Officer Burdick remembered hearing
a general broadcast that several robberies had occurred in the area involving
men in a white truck impersonating police officers.  Once the men were safely under arrest,
officers searched the truck and recovered two flashlights, a plastic gun, a
small black bat or nightstick, a Q-Beam spotlight, a hand-held radio, and a
paper bag with several phrases, such as “I am the Immigration police” and “put
your hands up,” written on it in Spanish. 
Police also recovered pawn slips for assorted jewelry and a lawn mower, a
wallet not belonging to either passenger, and several rings of keys.

           When asked where he lived, Jackowski responded
that he was staying at a nearby motel, so Officer Burdick and another officer, Lieutenant
Casko, went to the motel to investigate. 
Upon arriving, Lieutenant Casko went to rooms twenty-nine and thirty,
which he believed were occupied by Brown and Jackowski, while Officer Burdick
confirmed with the motel manager that those rooms were occupied by individuals
driving a white truck. 

Beatrice Sanchez, Brown’s wife and
Sanchez’s sister, answered the door when Lieutenant Casko knocked, and told
Lieutenant Casko that she was staying in the room.  He asked if anyone else occupied the room,
she replied that no one did, and then verbally agreed to let Casko come in and
look around.  Casko entered the room
alone to check for other occupants.  He
did not have his gun drawn when talking to Beatrice, but did have it in hand
while looking around the corner into the bathroom for other occupants.  While checking for other occupants, Casko
noticed narcotics paraphernalia in plain view near the bed.  He returned to Beatrice outside the room,
where he was rejoined by Burdick, to request written consent to search the room.
 

          Officer
Burdick prepared, read, and explained a voluntary consent-to-search form for
Beatrice and asked whether she had questions and understood the form.  After she signed the consent form, officers
searched the room and found a large black bag filled with dirty laundry.  A black fanny pack was discovered in the bag
along with the laundry.  The fanny pack
contained driver’s licenses, resident alien cards, credit cards, social security
cards, and two checkbooks. 

Legal and Factual Sufficiency

In its motion for rehearing, the
State contends (1) that Brown’s appellate brief did not raise a specific challenge
to the factual sufficiency of the evidence with regard to the deadly weapon element
of aggravated robbery, and (2) the evidence is factually sufficient to support
the jury’s finding of the deadly weapon element of aggravated robbery.  We agree with the State’s second issue in
light of the Texas Court of Criminal Appeals’ recent opinion in Watson v. State, overruling the factual sufficiency standard of review from Zuniga v. State.  Watson
v. State, 204 S.W.3d 404, 415–17 (Tex. Crim. App. 2006) (overruling Zuniga
v. State, 144 S.W.3d 477, 484–85 (Tex.
Crim. App. 2004)).  Because the State’s
second issue is dispositive, we do not address the waiver argument in the
State’s first issue.

In his first, second, and third
issues, Brown contends (1) the evidence is legally and factually insufficient
to sustain the jury’s finding that Brown committed a robbery with a deadly
weapon, (2) the evidence is legally and factually insufficient to support
Brown’s conviction for impersonating a police officer, and (3) the evidence is
legally and factually insufficient to support either of Brown’s convictions
under the law of parties.

A. 
Standard of Review 

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S.
307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795,
798 (Tex.
Crim. App. 2005).  The standard is the
same for both direct and circumstantial evidence cases.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  We do not
resolve any conflict of fact, weigh any evidence, or evaluate the credibility
of any witnesses, as this was the function of the trier of fact.  See Adelman v. State, 828 S.W.2d 418,
421 (Tex. Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim.
App. 1991).  Instead, our duty is to
determine whether both the explicit and implicit findings of the trier of fact
are rational by viewing all the evidence admitted at trial in the light most
favorable to the verdict.  See Adelman,
828 S.W.2d at 422.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.

When conducting a factual sufficiency
review, we view all of the evidence in a neutral light.  Ladd v. State,
3 S.W.3d 547, 557 (Tex. Crim. App.
1999).  We will set the verdict aside only if (1) the evidence is so weak
that the verdict is clearly wrong and manifestly unjust or (2) the verdict is
against the great weight and preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  Under the first prong of Johnson, we cannot
conclude that a conviction is “clearly wrong” or “manifestly unjust” simply
because, on the quantum of evidence admitted, we would have voted to acquit had
we been on the jury.  Watson, 204 S.W.3d at 417.  Under the
second prong of Johnson, we cannot declare that a conflict in the
evidence justifies a new trial simply because we disagree with the jury’s
resolution of that conflict.  Id.  Before
finding that evidence is factually insufficient to support a verdict under the
second prong of Johnson, we must be able to say, with some objective
basis in the record, that the great weight and preponderance of the evidence
contradicts the jury’s verdict.  Id.  In
conducting a factual sufficiency review, we must also discuss the evidence
that, according to the appellant, most undermines the jury’s verdict.  See Sims v. State, 99 S.W.3d 600, 603 (Tex.
Crim. App. 2003).  

         
We may not re-weigh the evidence and substitute our judgment for that of the
fact-finder.  King v. State, 29 S.W.3d 556, 562 (Tex.
Crim. App. 2000).  The fact-finder alone
determines what weight to place on contradictory testimonial evidence because
that determination depends on the fact-finder’s evaluation of credibility and
demeanor.  Cain v. State, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).  As the determiner of
the credibility of the witnesses, the fact-finder may choose to believe all,
some, or none of the testimony presented.  Id. at 407 n.5.

B. 
Aggravated Robbery

Brown contends the evidence is legally
and factually insufficient to prove beyond a reasonable doubt that either he or
Sanchez used a firearm in the commission of the robbery, and is thus
insufficient to support his conviction for aggravated robbery.

A person is guilty of aggravated
robbery if he uses or exhibits a deadly weapon in the course of committing a
robbery.  Tex. Pen. Code Ann.
§ 29.03(a)(2) (Vernon 2003). 
Proof of the use or exhibition of a deadly weapon is an essential
element of the offense of aggravated robbery.  Gomez v. State, 685 S.W.2d 333, 336 (Tex.
Crim. App. 1985).  A deadly
weapon is a firearm or anything manifestly designed,
made, or adapted for the purposes of inflicting serious bodily injury or
anything that, in the manner of its use or intended use, is capable of causing
death or serious bodily injury.  Tex. Pen. Code Ann.
§ 1.07(a)(17)(A), (B) (Vernon Supp. 2006).  

Here, Brown’s indictment alleges not
merely that he exhibited a deadly weapon, but that he exhibited a firearm.  When the State alleges unnecessary matters that
are descriptive of the essential elements of the crime, the State must prove
the descriptive matters as alleged.  Gomez,
685 S.W.2d at 336.  Thus, when
the State alleges in an indictment for aggravated robbery that the deadly
weapon used by the defendant was a firearm, as it did in this case, it is
required to prove use of a firearm beyond a reasonable doubt.  Edwards
v. State, 10 S.W.3d 699, 701 (Tex. App.—Houston
[14th Dist.] 1999), pet. dism’d,
improvidently granted 67 S.W.3d 228 (Tex. Crim. App. 2002).  A “firearm” means any device
designed, made, or adapted to expel a projectile through a barrel by using the
energy generated by an explosion or burning substance or any device readily
convertible to that use.  Tex. Pen. Code Ann. § 46.01(3) (Vernon
2003).  

Brown’s indictment also charges him as a party
to the offense of aggravated robbery.  In
order to convict Brown as a party to aggravated robbery, the State had to prove
that he was criminally responsible for Sanchez’s use or exhibition of a firearm
during the offense.  See Stephens v.
State, 717 S.W.2d 338, 340 (Tex. Crim. App. 1986) (holding that, in order
to convict defendant as party to aggravated offense, State must prove that
defendant was criminally responsible for aggravating element); Wooden
v. State, 101 S.W.3d 542, 547–48 (Tex. App.—Fort Worth 2003,
pet. ref’d) (same).  A person
is criminally responsible for the conduct of another if, “acting with intent to
promote or assist the commission of the offense, he solicits, encourages,
directs, aids, or attempts to aid the other person to commit the offense.”  Tex.
Pen. Code Ann. § 7.02(a)(2) (Vernon 2003); Wooden, 101 S.W.3d at
546.  In determining whether an accused
bears criminal responsibility for an offense, we may look
to events before, during, and after the commission of the offense.  Marable v. State, 85
S.W.3d 287, 293 (Tex. Crim. App. 2002).

Legal Sufficiency

Viewing the evidence in the light
most favorable to the verdict, a rational trier of fact
could have found beyond a reasonable doubt that Brown is guilty of aggravated
robbery.  Galvez testified that after
Brown and Sanchez pulled him over in front of his house, he exited his truck, and
Sanchez told him to wait there while he verified Galvez’s information in his
computer.  After waiting a few minutes,
Galvez approached Sanchez’s truck, and Sanchez pushed Galvez against the truck
and put a gun near his head.  Galvez
testified that Sanchez’s gun was the kind that “you can pull in the back of it,”
and that it was “cold.”  Galvez testified
that while this occurred, Brown remained on the passenger’s side of Sanchez’s
truck, shining a light at Galvez’s house and license plate and pointing
something toward Galvez’s house.  Brown
told Amanda and the children in English to go inside or something bad was going
to happen, and made signs as if he had a weapon.  Galvez testified that it looked as though
Brown had a gun, but that he could not tell what was in Brown’s hand.  Both Amanda and Galvez testified that they
were afraid.  Amanda testified that she
came out of the house three separate times during the robbery.  The third time she went outside, Amanda
noticed that Brown had a gun and that he was pointing it at her and the
children.  Brown tried to blind Amanda
with his flashlight but she could still see him.  Amanda also testified that Sanchez held a gun
to Galvez’s head.  We conclude that,
viewing this evidence in a light most favorable to the verdict, a rational jury
could have found beyond a reasonable doubt that Brown used a firearm during the
commission of the robbery.  See Wright v. State, 591 S.W.2d 458, 459
(Tex. Crim. App. 1979) (holding that evidence defendant pointed “gun,”
“pistol,” or “revolver” at complainant was sufficient to prove use of “deadly
weapon”).  We also conclude that a
rational jury could have found beyond a reasonable doubt that Sanchez used a
firearm during the commission of the robbery, and that Brown, acting with
intent to assist the commission of the robbery, attempted to aid Sanchez in
using a firearm to threaten Galvez.  See
Marable, 85 S.W.3d at 293.

Factual Sufficiency

Viewing all the evidence in a neutral
light, we conclude the evidence is factually sufficient to sustain Brown’s
conviction for aggravated robbery as the primary actor and under the law of
parties.  Galvez testified that during
the course of the robbery he mainly paid attention to Sanchez.  He testified that it was nighttime and he saw
Brown from far away.  Galvez was not able
to describe Brown’s gun.  Galvez
testified that he was not sure Brown had a gun, but that he was pointing
something toward his house that looked like a weapon.  Galvez further testified that after Brown and
Sanchez pulled him over in front of his house, Sanchez told him to wait by his
vehicle while he went to check the computer in his truck.  After waiting a few minutes, Galvez
approached the truck, and Sanchez pushed Galvez against the truck and put a gun
to his head.  Galvez described the gun as
one of “those ones you can pull in the back of it.”  He testified that he did not know whether it
was real or fake, but that it was “ugly” and “cold.”  Galvez testified that while this occurred,
Brown remained on the passenger’s side of Sanchez’s truck, shining a light at
Galvez’s house and license plate and pointing something toward Galvez’s house
that looked like a weapon.  Amanda
testified that she saw Sanchez holding a gun to Galvez’s head the third time
she went outside.  After Amanda returned
to her house, she looked out the window and once again saw Sanchez holding a
gun to Galvez’s head.  

Amanda testified that she came out of the house three
separate times during the robbery.  The
first time she noticed that the men were not friends of her husband so she
immediately went back inside.  The second
time, her children ran out of the house to see Galvez and Amanda went after
them.  While she was outside, she saw
Brown holding a bright light in his left hand and a walkie-talkie in his right
hand.  Amanda then went outside a third
time with her children close behind her. 
As she walked toward Brown, she saw that he was holding a bright light
in his left hand and a gun in his right hand. 
Brown pointed the gun at Amanda and her children and said, “bitch, get
in the house or there’s going to be problems for you and your family.”  Brown tried to blind Amanda with the light
but she testified that she could still see him. 
As soon as Amanda re-entered the house, she looked out the window and
saw Brown using the walkie-talkie. 
Officer Burdick testified that when he pulled Brown over nine days after
the incident, he found two flashlights, a Q-Beam spotlight, a hand-held radio,
a nightstick, and a plastic handgun.  Police
never recovered an actual firearm.  

In Wright
v. State, the Court of Criminal Appeals affirmed an aggravated robbery
conviction where the victim referred to the defendant’s weapon as a “gun,” “pistol,”
or “revolver.”  591 S.W.2d at 459.  The appellant asserted that evidence is
sufficient only if the witness uses the term “firearm” or otherwise proves the
use of a “deadly weapon” under one of the alternative definitions.  Id.  The court stated, “testimony using any of the
terms ‘gun’, ‘pistol’ or ‘revolver’ is sufficient to authorize the jury to find
that a deadly weapon was used.”  Id.  The court held that the State is not required
to offer testimony that the defendant used a “firearm,” or otherwise prove the
use of a “deadly weapon” under one of the alternative definitions, to sustain
an aggravated robbery conviction.  Id.     

The evidence surrounding Brown’s gun in this
case is conflicting.  Amanda
unequivocally testified that she saw Brown holding a gun and that he pointed it
at her and the children.  Brown tried to
blind her with a flashlight but she could still see him.  Galvez testified that he was not sure Brown
had a gun, but Brown was pointing something toward his house that looked like
it could have been a weapon.  The police,
however, found a plastic gun when they searched the white Chevy truck nine days
after the robbery and never recovered a real gun.  

The evidence surrounding Sanchez’s gun is also
conflicting.  Galvez testified that
Sanchez held a gun to his head, it felt cold, and it was the kind that you pull
in the back.  Galvez, however, also
testified that he could not tell if the gun was real or fake.  Amanda testified that she too saw Sanchez
holding a gun to Galvez’s head on two separate occasions.  

Under Watson
v. State, a conflict in the evidence does not justify a new trial simply
because an appellate court might disagree with the jury’s resolution of the
conflict.  204 S.W.3d at 417. 
On this record, the great weight and preponderance of the evidence
does not contradict the jury’s firearm finding. 
Id.  We therefore hold that the evidence is
factually sufficient to support Brown’s conviction for aggravated
robbery with a firearm as the primary actor and under the law of parties.

Under the former factual sufficiency
standard of review from Zuniga, which
we relied upon in our original opinion, the Court of Criminal Appeals stated:  

[T]here are two ways in which the evidence
may be insufficient.  First, when
considered by itself, evidence supporting the verdict may be too weak to
support the finding of guilt beyond a reasonable doubt.  Second, there may be both evidence supporting
the verdict and evidence contrary to the verdict.  Weighing all the evidence under this balancing
scale, the contrary evidence may be strong enough that the
beyond-a-reasonable-doubt standard could not have been met, so the guilty
verdict should not stand.

 

144 S.W.3d at 484–85.  In Watson,
the Court of Criminal Appeals recognized that this language is problematic
because it allows an appellate court to
reverse a case on factual sufficiency grounds when the evidence does not
satisfy the court’s own threshold of
proof for the beyond-a-reasonable-doubt standard.  204 S.W.3d at 416.  Under this interpretation, the appellate
court might therefore reverse a case because it simply
disagrees with the jury’s verdict, but until Zuniga, the court observed, the fact “[t]hat an appellate
court would have acquitted a defendant on the same facts that convinced a
rational jury to convict has not ever, by itself, met our criteria of a
‘manifest injustice.’”  Id.  

The Zuniga
court further elaborated on its factual sufficiency formulation when it stated:


This standard acknowledges that evidence
of guilt can “preponderate” in favor of conviction but still be insufficient to
prove the elements of the crime beyond a reasonable doubt.  Stated another way, evidence supporting guilt
can “outweigh” the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard.

 

144 S.W.3d at 485.  The Watson court noted that this language
was particularly troublesome.  204 S.W.3d
at 416.  The first sentence suggests that evidence that is legally
sufficient to convict might still be factually insufficient if it merely “preponderates” in favor of guilt,
rather than establishing guilt beyond a reasonable doubt.  Id.  Thus, even if the appellate court concludes
that a rational jury could find guilt to the requisite level of confidence
beyond-a-reasonable-doubt, that same appellate court should order a new trial
if, viewing that same evidence neutrally, it is subjectively convinced by no more than a preponderance of the
evidence.  Id.  The
second sentence suggests that even if the State’s evidence of guilt is weightier and more credible than the defendant’s contrary evidence, and
therefore “preponderates” in favor of guilt, an appellate court could find that
it does not meet its own
threshold level of confidence beyond a reasonable doubt, and reverse and remand
on that basis.  Id.  

We based our prior
holding in this case on the language from the Zuniga opinion that the Court of Criminal Appeals has now expressly
disavowed in Watson.  Specifically, we relied on the second prong
of Zuniga and held that evidence
contrary to the jury’s verdict was strong enough that the
beyond-a-reasonable-doubt standard could not have been met.  As the court
clarified in Watson, however, before finding that evidence is
factually insufficient to support a verdict under the second prong of Johnson,
we must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts
the jury’s verdict.  Id.  In this case, the evidence is factually
sufficient to support Brown’s aggravated robbery conviction as the primary
actor and under the law of parties because we cannot say that the great weight
and preponderance of the evidence contradicts the jury’s verdict.  Though the evidence is conflicting, and the
police recovered a toy gun nine days after the robbery, the later recovery of
the toy gun does not contradict Amanda’s testimony that Brown threatened her
and her children with a gun on the night in question.

In Pena Cortez v. State, the Corpus Christi Court of Appeals held that
testimony regarding the use of a “pistol” was insufficient to sustain an
aggravated robbery conviction where it was uncontroverted that the “pistol” was
a toy gun.  732 S.W.2d
713, 715 (Tex. App.—Corpus Christi 1987, no pet.).  This case is distinguishable from Pena Cortez
in that there is no uncontroverted evidence that the toy gun found in Brown’s
truck nine days after the robbery was the same gun used during the robbery.  This case is also similar to
cases in which courts found the evidence sufficient to support the finding of a
firearm.  See, e.g., Edwards,
10 S.W.3d at 701–02 (evidence sufficient to support conviction for aggravated
robbery where there was evidence that defendant threatened victims with gun,
and two victims, one of whom stated that she was security guard once and was
familiar with guns, testified that gun used in robbery resembled Colt .45
handgun and not BB gun); Carter v. State, 946 S.W.2d 507, 509 (Tex.
App.—Houston [14th Dist.] 1997, pet. ref’d) (victims’ testimony that defendant
used gun similar to .25 caliber gun shown at trial, and threatened to shoot
victims if they did not do as he ordered, was sufficient to authorize rational
jury to find that firearm was used during offense); Benavides v. State, 763 S.W.2d 587, 588–89 (Tex. App.—Corpus
Christi 1988, pet. ref’d) (evidence was sufficient to show that firearm was
used during robbery and was thus sufficient to support conviction for
aggravated robbery where victim, who viewed defendant from close proximity, testified
that defendant used “gun” that was “automatic” and “medium-sized”).  

C. 
Impersonating a Public Servant

          Brown
also challenges the legal and factual sufficiency of the evidence to support
his conviction for impersonating a public servant.  Section 37.11(a)(1) of the Penal Code provides
that “[a] person commits an offense if he impersonates a public servant with
intent to induce another to submit to his pretended official authority or to
rely on his pretended official acts.”  Tex. Pen. Code Ann. § 37.11(a)(1)
(Vernon 2003).  

Here, Galvez testified that while cashing his paycheck
at a convenience store, he had a conversation with some of his friends who work
at a strip club.  On his way home, he
noticed that he was being followed by a white truck he had seen at the
convenience store displaying what appeared to be police lights.  When Galvez stopped in his driveway, Sanchez
approached his vehicle, showed him a police badge, and told him in broken
Spanish that he had been stopped for soliciting prostitution and drugs.  Sanchez asked for Galvez’s ID and told him he
was going to check the information in his computer.  Galvez testified that Sanchez also told him
to spread his legs and place his hands on the seat of the car, and that when real
police officers had stopped him in the past, they had asked him to do the same
thing.  While this was taking place,
Brown stood by the passenger’s side of the truck, flashing a light at the tags
on Galvez’s vehicle.  When Galvez approached
the truck, Sanchez pushed him against it, and Brown asked if Galvez “was
clean,” meaning did he have a weapon. 
Amanda testified that Brown was shining a light at her and at some point
appeared to be talking on a walkie-talkie. 
Amanda identified Brown as having participated in the incident.  Two flashlights, a Q-Beam spotlight, a nightstick,
a walkie-talkie, and a plastic gun were found in Brown’s truck when he was
pulled over.  A search of Brown’s vehicle
also revealed several rings of keys, cellular phones, and a brown paper sack
with police phrases written on it in Spanish. 
Galvez identified his assailant’s vehicle as a white 1988–96 Chevy
truck.  The police later pulled Brown over
while he was driving a 1988 white Chevy truck. 
Viewing
this evidence in the light most favorable to the verdict, we conclude that a
rational jury could have found beyond a reasonable doubt that Brown
impersonated a police officer.  In
addition, viewing the evidence in a neutral light, we conclude that the jury
was rationally justified in finding Brown guilty of impersonating a police
officer beyond a reasonable doubt.

D.  Identity

          Brown contends the identification evidence in the
record is factually insufficient to support either of his convictions.  Before trial, Galvez identified Brown in a
photograph line-up by writing his signature underneath Brown’s picture.  Galvez admitted that he identified Brown’s
picture after Amanda, and that her signature was already under Brown’s picture
when he made his identification.  During
cross-examination, Galvez also admitted that it was dark on the night of the
robbery and he could not see very well. 
Galvez could not see what Brown was wearing during the robbery because
Brown was standing behind one of the truck doors.  Officer Brillon testified that he did not
remember Galvez identifying Brown in the photograph line-up, but acknowledged
that Galvez’s signature under Brown’s picture indicates that he did make the
identification.  Brillon’s report does
not indicate that Galvez identified Brown. 
Officer Hernandez, who was also present during the line-up, did not
recall that Galvez identified Brown.

Amanda went outside three separate
times during the course of the robbery and looked out a window once.  Brown tried to blind her with his flashlight several
times but she testified that she could still see his face.  She also testified that her porch light was
on during the robbery.  Amanda
testified that she stood twelve paces from where the incident occurred, and
that she was too far away and it was too dark to describe Brown’s facial
features, determine if he had scars or tattoos, determine the color of his
eyes, or determine whether he had facial hair. 
Amanda identified Brown in the photograph line-up, as well
as in court.  

Galvez and Amanda both testified that
the automobile used in the robbery was a white Chevy pickup truck.  The police arrested Brown and Jackowski nine
days after the robbery driving a white Chevy truck.  After searching the truck, the police found
two flashlights, a plastic gun, a small black nightstick, a Q-Beam spotlight, a
hand-held radio, and a paper bag with several police phrases written on it in
Spanish.  Police also recovered pawn
slips for assorted jewelry and a lawn mower, a wallet not belonging to either
passenger, and several rings of keys.

When asked where he lived, Jackowski
responded that he was staying at a nearby motel, so Officer Burdick and
Lieutenant Casko went to the motel to investigate.  Upon arriving, Lieutenant Casko went to rooms
twenty-nine and thirty, which he believed were occupied by Brown and Jackowski,
while Officer Burdick confirmed with the motel manager that those rooms were
occupied by individuals driving a white truck. 

Beatrice (Brown’s wife and Sanchez’s
sister) answered the door when Lieutenant Casko knocked, and told Lieutenant
Casko that she was staying in the room. 
He asked if anyone else occupied the room, she replied that no one did,
and then verbally agreed to let Casko come in and look around.  While checking for other occupants, Casko
noticed narcotics paraphernalia in plain view near the bed.  Beatrice consented to a search of the room
and the officers found a large black bag filled with dirty laundry.  A black fanny pack was discovered in the bag
along with the laundry.  The fanny pack contained
driver’s licenses, resident alien cards, credit cards, social security cards,
and two checkbooks.  

The identity evidence in this case is
not so weak that the jury’s verdict seems clearly wrong and manifestly unjust,
nor can we say that the jury verdict is against the great weight and preponderance
of the evidence.  Watson, 204 S.W.3d at 417; Johnson, 23 S.W.3d at 11.  The testimony surrounding Galvez’s
identification of Brown is not very strong. 
Both officers present during the photograph line-up could not recall if
Galvez identified Brown, and Galvez admitted that he could not see Brown very
well during the robbery.  Amanda’s
identification testimony was much stronger. 
Amanda identified Brown during the photograph line-up, as well as in
court.  The circumstantial evidence
discovered in Brown’s truck, as well as the circumstantial evidence discovered
in his motel room, also link Brown to the crimes in this case.  The truck itself affirmatively links Brown to
the crimes as well.  Both Galvez and
Amanda testified that the robbery was perpetrated by men driving a white Chevy
truck, the same type of truck Brown was driving when police arrested him.  We therefore conclude that viewing the
evidence in a neutral light, the identification evidence is factually
sufficient to sustain Brown’s convictions for aggravated robbery and
impersonation of a public servant.  See Apolinar
v. State, 106 S.W.3d 407, 412–13 (Tex.
App.—Houston [1st Dist.] 2003), aff’d, 155 S.W.3d 184, 191 (Tex. Crim. App. 2005) (holding that evidence was factually sufficient to identify
defendant as perpetrator of aggravated robbery, even though victim demonstrated
memory and vision problems at trial; victim identified defendant three times at
trial, witness testimony was fairly consistent in describing defendant’s
appearance, and officers later found knife with blade consistent with
defendant’s arm wound); Wimbrey
v. State, 106 S.W.3d 190, 191–93 (Tex. App.—Fort Worth 2003,
pet. ref’d) (holding evidence was factually sufficient to support defendant’s conviction for aggravated
robbery; two employees of video store testified defendant entered store,
approached counter, surreptitiously pointed gun at them, and forced them to
empty contents of cash registers into bag, both employees separately identified
defendant in photograph line-up two months after robbery, and both identified
defendant as man who robbed store at trial); Fluellen
v. State, 104 S.W.3d 152, 160–61 (Tex. App.—Texarkana 2003,
no pet.) (holding evidence was factually sufficient to identify defendant as person who sold cocaine to undercover police
officer, in prosecution for delivery of controlled substance in drug free zone;
officer identified
defendant as person who sold him cocaine at trial, and officer identified voice on audiotape of
transaction as that of defendant).

Motion to Suppress

          In
his fourth issue, Brown contends the trial court erred in denying his motion to
suppress the evidence seized from the motel room because (1) the State failed
to establish that Beatrice had actual authority to consent to a search of the
motel room, and (2) the State failed to establish that her consent was
voluntary.  The State responds that Brown
lacks standing to challenge the search, that the police obtained valid and
voluntary consent, and that Brown was not harmed by admission of the evidence.  

A. 
Facts 

Immediately after arresting Brown and
Jackowski, and after discovering evidence that they believed might link Brown
and Jackowski to a series of robberies involving impersonation of police
officers, Officer Burdick and Lieutenant Casko went to the motel where
Jackowski claimed he was staying.  Upon arriving,
Casko went to rooms twenty-nine and thirty, which he believed were occupied by
Brown and Jackowski, while Burdick confirmed with the motel manager that those
rooms were occupied by individuals driving a white truck.  Beatrice answered the door when Casko knocked
and told him that she was staying in the room. 
He asked if anyone else occupied the room, she replied that no one did,
and then verbally agreed to let Casko come in and look around.  Casko entered the room alone to check for
other occupants.  He did not have his gun
drawn when talking to Beatrice, but did have it in hand while looking around
the corner into the bathroom for other occupants.  While checking for other occupants, Casko
noticed narcotics paraphernalia in plain view near the bed.  He returned to Beatrice outside the room,
where he was rejoined by Burdick, to request written consent to search the
room.  

          Officer
Burdick prepared, read, and explained a voluntary consent-to-search form for
Beatrice and asked whether she had questions and understood the form.  After she signed the consent form, officers
searched the room and found a large black bag filled with dirty laundry.  The officers discovered a black fanny pack in
the bag along with the laundry.  The
fanny pack contained driver’s licenses, resident alien cards, credit cards,
social security cards, and two checkbooks, none of which belonged to Beatrice, Brown,
or Jackowski. 

B. 
Standard of Review

          We
apply a bifurcated standard of review to motions to suppress, giving almost
total deference to a trial court’s determination of historical facts, while
reviewing de novo the court’s application of the law.  See Dyar v. State, 125 S.W.3d 460, 462
(Tex.
Crim. App. 2003).  In a motion to
suppress hearing, the trial court is the sole trier of fact and judge of the
credibility of the witnesses and the weight to be given to their testimony.  State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000); Foster v. State, 101 S.W.3d 490, 495 (Tex. App.—Houston
[1st Dist.] 2002, no pet.).  Accordingly,
the trial court may believe or disbelieve all or any part of a witness’s
testimony, even if that testimony is not controverted.  Ross, 32 S.W.3d at 855.  If, as here, the trial court files no
findings of fact, we view the evidence in a light most favorable to the ruling
and will uphold a trial court’s ruling on any theory of law supported by the
evidence.  Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005).

C. 
Standing

          We
must first determine whether Brown has standing to contest the search.  An accused has standing to contest a search
under the Fourth Amendment only if he has a legitimate expectation of privacy
in the place searched.  Rakas v. Illinois,
439 U.S.
128, 144, 99 S. Ct. 421, 430 (1978); Granados v. State, 85 S.W.3d 217,
222–23 (Tex.
Crim. App. 2002).  The defendant bears
the burden of establishing that he had a subjective expectation of privacy in
the place searched that society recognizes as reasonable.  Granados, 85 S.W.3d at 223.  Several factors are relevant to this latter
determination of whether a given claim of privacy is objectively reasonable:
(1) whether the accused had a property or possessory interest in the place
invaded; (2) whether he was legitimately in the place invaded; (3) whether he
had complete dominion or control and the right to exclude others; (4) whether,
prior to the intrusion, he took normal precautions customarily taken by those
seeking privacy; (5) whether he put the place to some private use; and (6)
whether his claim of privacy is consistent with historical notions of
privacy.  Id.  This list of factors is non-exhaustive, and
no one factor alone is dispositive of a legitimate expectation of privacy.  Id.

          The
State argues that because Brown claimed he was not staying in either motel
room, he did not have complete dominion and control, and thus lacks standing to
challenge the search.  The Supreme Court
has recognized that a registered guest at a hotel has a reasonable expectation
of privacy in the room that he or she has rented and, consequently, is entitled
to constitutional protection against unreasonable searches and seizures there.  See Stoner v. California, 376 U.S.
483, 490, 84 S. Ct.
889, 893 (1964).  The Supreme Court has
also held that an overnight guest in someone’s home has a legitimate
expectation of privacy.  Minnesota
v. Olson, 495 U.S.
91, 98, 110 S. Ct.
1684, 1689 (1990).  This court concluded
in Wilson v. State, based on the preceding Supreme Court precedent, that
an overnight guest of a registered hotel guest shares the
registered guest’s reasonable expectation of privacy in the room.  98 S.W.3d 265, 268–70 (Tex. App.—Houston
[1st Dist.] 2002, pet. ref’d).  

Here, Officer Burdick testified that
he spoke with the motel manager before police searched the room, and that the
manager confirmed that Brown and Jackowski had rented rooms twenty-nine and thirty
and had been staying there about a week. 
Brown testified that he had rented the rooms so Jackowski and Sanchez
could stay there, and so he could have sexual relations with his wife Beatrice.  Beatrice testified that she had been staying
in one of the rooms with Jackowski and Sanchez, and Brown would meet her
there.  Because Brown was the registered
motel guest and had stayed overnight in the room to spend time with his wife,
he had a legitimate expectation of privacy in the room.  See id. at 269.  Accordingly, we conclude Brown has standing
to contest the search.

D. 
Authority to Give Consent

Brown contends the fruits of the
warrantless search of his motel room should have been suppressed because
Beatrice lacked actual authority to consent to the search.  A warrantless search by law enforcement
officers does not violate the Fourth Amendment’s guarantee against unreasonable
searches and seizures if the officers have obtained the consent of a third
party that possesses common authority over the premises or effects sought to be
inspected.  United States v.
Matlock, 415 U.S.
164, 171, 94 S. Ct.
988, 993 (1974).  “Common authority”
rests on “mutual use of the property by persons generally having joint access
or control for most purposes.”  Id. at
171 n.7, 94 S. Ct.
at 993 n.7.  If consent was not obtained
from someone with actual authority to consent to a search, a search may
nevertheless be proper if the person giving consent had apparent authority.  Illinois
v. Rodriguez, 497 U.S.
177, 188–89, 110 S. Ct. 2793, 2801 (1990).  A third party’s consent is valid if the facts
available to the officer at the time of the search would warrant a person of
reasonable caution in believing that the consenting party had authority over
the premises.  See id. at 188, 110
S. Ct.
at 2801.  If an officer reasonably
believed that the third party had common authority over the place to be
searched, then his good faith mistake will not invalidate the search.  Id.  This deference
does not mean, however, that the officer may rely on consent given in ambiguous
circumstances or when it appears clearly unreasonable to believe the third
party is clothed with authority to give consent.  Riordan v. State, 905 S.W.2d
765, 771 (Tex. App.—Austin 1995, no pet.).

          Here,
Lieutenant Casko testified that when he knocked on the door to room thirty,
Beatrice answered the door.  Casko asked
her if she was staying in the room, and she told him that she was.  He asked her if there was anyone else in the
room with her, and she replied that there was not.  He then asked for verbal consent to search
the room for other people, which she granted. 
While checking for other individuals in the room, Casko noticed drug
paraphernalia on the table in plain view. 
When Officer Burdick arrived, he asked Beatrice for her written consent
to search the room.  Burdick testified
that he knew several people were staying in the room, one of whom was Brown’s
wife, Beatrice.  Based on this evidence,
Beatrice had at least apparent authority to consent to a search of the
premises.

          The
Supreme Court recently held, in Georgia v. Randolph, “that a physically
present inhabitant’s express refusal of consent to a police search is
dispositive as to him, regardless of the consent of a fellow occupant.”  126 S. Ct. 1515, 1528 (2006).  There, Randolph’s wife called the
police over a domestic dispute.  Id.
at 1519.  When police arrived, Randolph’s wife
told them that Randolph
used drugs and had drugs inside the house. 
Id.  Police asked Randolph
for consent to search the house, and he expressly refused.  Id.  Police then asked Randolph’s
wife for consent to search, which she granted. 
Id.  The Supreme Court held that Randolph’s
refusal to consent trumped his wife’s consent. 
Id.
at 1526.  The present case is
distinguishable, however, because Brown was not present when police asked
Beatrice for consent, and he did not expressly refuse consent prior to Beatrice
giving consent.  We conclude Beatrice had
apparent authority to consent to the officers’ search of the motel room.

E. 
Voluntariness of Consent

          Brown
next argues that even if Beatrice had authority to consent to the search, her
consent was involuntary.  When relying
upon consent to justify the lawfulness of a search, the State has the burden to
prove by clear and convincing evidence that the consent was freely and
voluntarily given.  Bumper v. North
Carolina, 391 U.S.
543, 548, 88 S. Ct. 1788, 1792 (1968); see also Corea v. State, 52
S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2001,
pet. ref’d).  The burden requires the
State to show that the consent was positive and unequivocal, and there was no
duress or coercion.  Meeks v. State,
692 S.W.2d 504, 509 (Tex. Crim. App. 1985); Riordan, 905 S.W.2d at 770.  The burden cannot be discharged by showing no
more than acquiescence to a claim of lawful authority.  See Bumper, 391 U.S.
at 548–49, 88 S. Ct.
at 1791­–92.  The validity of consent to search is
a question of fact to be determined from all the circumstances.  Rayford
v. State, 125 S.W.3d 521, 528 (Tex.
Crim. App. 2003).

          Here, Lieutenant Casko testified that he was alone when
Beatrice answered the motel room door, and that she gave verbal consent to search
for other individuals who might be in the room. 
Casko testified that he may have had his weapon drawn when he looked in
the bathroom, but that he never pointed it at Beatrice, and that the other
officers never had their weapons drawn.  After
he noticed some drug paraphernalia in plain view, Casko took Beatrice outside
where Officer Burdick asked her to sign a consent to search the room.  Burdick testified that he and Casko were the
only officers near Beatrice when she signed the consent.  He testified that she did not appear to be
intoxicated, that she could and did read the consent, that she could and did
speak English, and that he read and explained the consent form to her before
she signed it, including a statement that she did not have to give consent.  Both officers testified that she was not
under arrest at the time she signed the consent, and that she was at all times
cooperative with their investigation.  We
hold that Beatrice’s consent was voluntary, and thus the search of the motel
room was valid.  Accordingly, we overrule Brown’s fourth issue.
 

Extraneous
Offenses

          Brown contends the trial court erred in admitting testimony
regarding an extraneous offense allegedly committed by Brown because the State
failed to prove Brown had committed the offense beyond a reasonable doubt.  The State contends Brown failed to preserve
error on this issue for appeal.  To preserve an issue for
appeal, a party must timely object, stating the specific
legal basis.  Tex. R. App. P. 33.1(a)(1); Rhoades v. State, 934
S.W.2d 113, 121, 127 (Tex. Crim. App. 1996).  “To be timely, an objection must be raised at
the earliest opportunity or as soon as the ground of objection becomes
apparent.”  Penry v. State, 903
S.W.2d 715, 763 (Tex. Crim. App. 1995).  In the absence of a timely motion or
objection, nothing is presented for appellate review.  Cooper v. State, 500 S.W.2d 837, 841
(Tex. Crim. App. 1973).  Here, in a
hearing outside the presence of the jury, defense counsel objected to allowing
the witnesses to identify Brown in court, which the trial court sustained.  Counsel then objected to allowing any
testimony by one of the witnesses, without giving a basis for the objection,
and without obtaining a ruling.  Twice
after the witnesses had finished testifying, counsel objected that the
testimony was not relevant, and that its probative value was outweighed by its
prejudicial effect.  Counsel never
objected that evidence of the offenses should be excluded for failure to
demonstrate Brown’s involvement beyond a reasonable doubt.  Thus, this argument has not been preserved
for appeal.

Conclusion

We hold (1) the trial court did not err in
denying Brown’s motion to suppress because police obtained voluntary consent to
search the motel room from someone with apparent authority, (2) the evidence is
legally and factually sufficient to support Brown’s conviction for
impersonating a public servant, and (3) Brown failed to preserve error on his
argument that the extraneous offenses should not have been admitted because
they were not proven beyond a reasonable doubt. 
Accordingly, we affirm the judgment of the trial court in cause number
990262 (appellate cause number 01-05-00075-CR) as to Brown’s conviction for
impersonating a public servant.  We
further hold that the evidence is legally and factually sufficient to support
Brown’s conviction for aggravated robbery.  Accordingly, we affirm the judgment of the
trial court in cause number 990261 (appellate cause number 01-05-00074-CR) as to
Brown’s conviction for aggravated robbery.

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Justices Taft,
Higley, and Bland.

Publish.  Tex. R.
App. P. 47.2(b).











[1] As we have issued an opinion on rehearing, we deny
the State’s motion for en banc reconsideration as moot.  See
Brookshire Bros. v. Smith, 176 S.W.3d 30, 40 n.2 (Tex. App.—Houston [1st Dist.] 2004,
pet. denied).